UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
KATHY DREW-KING, Acting Regional Director of Region 29 of the National Labor Relations Board for and on behalf of the NATIONAL LABOR RELATIONS BOARD,

                        Petitioner,

       -against-

DEEP DISTRIBUTORS OF GREATER NY, INC., d/b/a THE IMPERIAL SALES, INC.,

                        Respondent.
----------------------------------------------------------------X

**FILED**
**CLERK**
7/5/2016 3:20 pm
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM AND ORDER**
16-CV-1916 (SJF) (AKT)

FEUERSTEIN, District Judge:

      Petitioner Kathy Drew-King, acting Regional Director of Region 29 of the National Labor Relations Board ("Petitioner" or "the Board"), brings this petition on the Board's behalf seeking a temporary injunction pursuant to section 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j), pending the final disposition of unfair labor practice charges contained in a complaint that is the subject of ongoing proceedings before the Board.  *See* Petition, Docket Entry ("DE") [1].   Petitioner alleges that Deep Distributors of Greater NY, Inc. d/b/a The Imperial Sales, Inc. ("Respondent") has engaged in, and is engaging in, acts and conduct in violation of Section 8(1) and (3) of the Act.

      On May 23, 2016, subsequent to the filing of this action, Administrative Law Judge Steven Davis (the "ALJ") issued a Decision and Order in the underlying matter.  *See* ALJ Decision of 5/23/16 (the "ALJ Decision" or "ALJ Dec."), DE [13].   According to petitioner, the ALJ Decision is not the final administrative decision of the Board and, as a final decision "could be months or even years away," the need for injunctive relief sought in the petition remains necessary.  *See* Letter, DE [13].   For the reasons set forth herein, the petition is granted.

I.      BACKGROUND

A.      Factual Background

Respondent is engaged in the non-retail sale of beauty, appliance, and housewares products.   Retail stores purchase the products, and Respondent then ships those purchases to retailers and on-line purchasers.   Respondent employs approximately 20 employees at its warehouse, in Syosset, New York and later Bethpage, New York.   The petition alleges that Tony Bindra ("Bindra") is the owner of Respondent, Herb Miller ("Miller") is the warehouse manager, and Amjad Malik ("Malik") is the assistant warehouse manager.

1.   Union activity and election

In approximately January 2015, employee Henry Hernandez ("H. Hernandez") and several warehouse co-workers became interested in joining a union.   Various workers, including Jose Wilfredo Argueta ("Argueta"), began to meet with Wester Fabres ("Fabres"), Union agent for United Workers of America, Local 660 (the "Union").   Fabres periodically parked his car, which bore a large flag reading "Local 660," across from the warehouse in view of management.   On February 10, 2015, the Union filed a petition seeking to represent Respondent's warehouse employees.   Petitioner claims that on or about February 17, 2015, Malik gave employees the impression that their Union activities were under surveillance by Respondent.

On February 26, 2015, the Union and Respondent stipulated to holding an election on March 24, 2015.   On March 6, 2015, a week after the petition for the election was filed, three employees, Argueta, Jose Martin Torres ("J. Martin Torres"), and his brother, Jose Michel Torres ("J. Michel Torres"), were discharged.   According to Miller, Bindra had asked him to recommend employees to terminate because the weather was harsh and there was a slowdown of business. Miller and Bindra decided to terminate J. Martin Torres because he was a temporary employee,

2

Argueta because of his "safety problems," and J. Michel Torres as the "least productive worker." Petitioner contends that the three employees were terminated because they joined and assisted the Union, and participated in concerted activities. In the four years Argueta worked for Respondent, he had not been suspended or disciplined, and he did not receive any written warnings. While Respondent claimed that J. Martin Torres was temporarily employed to replace a specific worker, that employee had returned to work three weeks prior to Torres's discharge.

On or about March 9, 2015, Miller called a meeting of all employees at the Syosset Facility. Petitioner claims that Miller threatened the employees with unspecified reprisals if they selected the Union to represent them, told them it would be futile to join the Union, and threatened them with discharge if they chose to have the Union act as their collective bargaining representative.

The election was held on March 24, 2015. At the election, of the twenty (20) eligible voters, nine (9) votes were cast in favor of the Union, and five (5) were cast against. Both sides challenged the result.[1]

2.   FLSA litigation

On July 8, 2015, thirteen then-current and past employees of Respondent commenced a federal lawsuit in this District alleging, *inter alia,* failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and New York law.[2]   On or about July 14, 2015, Bindra interrogated one employee in his office about the FLSA lawsuit, held an

---

[1] Five (5) ballots were challenged – Respondent challenged ballots cast by Argueta, J. Martin Torres, and J. Michel Torres, and the Union challenged ballots cast by Malik and Manjit Singh.   ALJ Dec. at 2.

[2] The thirteen plaintiffs are Jose Reyes, Jairo Bonilla, Augustin Sabillon, Javier Reyes, Selvin Vasquez, Marvin Hernandez, Henry Hernandez, Jose Olan Amador, Armando Lazo, Valerio Baquedano, Jose Michel Torres, Jose Argueta, and Noel Efrain Castro, and the docket number of the case is 15-cv-3980 (JMA)(ARL).   The case remains pending.

3

employee meeting about their involvement with the FLSA lawsuit, and threatened them with unspecified reprisals.

On or about July 21, 2015, Respondent implemented new work rules regarding discipline for lateness and on-the-job use of cell phones (the "Code of Conduct").  No written work rules existed prior to this time.  Employees were directed to sign a form acknowledging the Code of Conduct.  Five employees, H. Hernandez, Marvin Hernandez ("M. Hernandez"), Roberto Reyes ("R. Reyes"), Javier Reyes ("J. Reyes"), and Augustin Sabillon ("Sabillon"), all of whom were named plaintiffs in the FLSA lawsuit, refused to sign and were terminated on the spot.  Petitioner alleges that Respondent instituted the Code of Conduct to discourage employees from engaging in protected activity, specifically the FLSA lawsuit.

**B.     Procedural Background**

On March 10, 2015, the Union filed an unfair labor practice charge on behalf of Argueta, J. Martin Torres, and J. Michel Torres, alleging that they were terminated from their employment because of their support for, and activities on behalf of, the Union.  The Union filed amended charges on March 12 and August 31, 2015 to add allegations that respondent threatened employees with reprisals and discharge if they supported the Union.

On July 31, 2015, H. Hernandez filed a charge alleging that he and fellow employees J. Reyes, M. Hernandez, R. Reyes, and Sabillon, were terminated because of their protected activities related to filing the FLSA lawsuit.  H. Hernandez amended his charge to include allegations that respondent unlawfully interrogated and threatened employees.

The various charges were consolidated by the Board's Regional Director into an Amended Consolidated Complaint, and a hearing was held on December 9, 11, 21, 22, and 23, 2015 and January 20, 22, 26, and 27, 2016 before ALJ Steven Davis.  During the proceedings, Counsel for

the General Counsel of the petitioner moved to further amend the Amended Consolidated Complaint to: (1) on December 9, 2015, add allegations that Respondent's new work rules and cell phone policies were implemented in retaliation for employees' protected activities; (2) on December 11, 2015, add allegations that Respondent, by its counsel, threatened employees with legal action in retaliation for testifying at the hearings and further threatened to report employees to governmental authorities in an attempt to intimidate them from participating in the hearings; and (3) on December 22, 2015, correct an allegation that Tony Bindra interrogated and threatened employees while at the Bethpage facility rather than the Syosset facility.  The ALJ granted all three motions to amend.

**C.     The ALJ Decisions**

The ALJ issued his decision on May 6, 2016.  *See* ALJ Dec., DE [13].  On May 25, 2016, the ALJ issued an Order Modifying Order in Previous Decision that amended the Remedy, Order and Notice portions of the first decision.  *See* Order Modifying Order ("ALJ Dec. II"), DE [17]. After the ALJ's initial decision was rendered, Respondent submitted an additional brief, *see* DE [15], and petitioner responded.  *See* DE [16].  Thus the parties have had an opportunity to address the specific findings in the ALJ Decision.

The ALJ credited the testimony of Petitioner's employee-witnesses, noting that they testified "in a forthright, believable manner."  ALJ Dec. at 18.  Regarding the Respondent's witnesses, the ALJ noted that he could <u>not</u> find that they "gave truthful testimony in important areas of their recitations."  *Id.*  Specifically, he noted that Miller "denied material parts of his March 10 meeting with the workers when the recording of that meeting clearly showed that he made those statements" and further noted "Respondent's implicit acknowledgement that Miller was untruthful" evidenced by its decision to change its answer to admit that threats were made.

5

*Id.* The ALJ also found Bindra's testimony to be "extremely evasive and not believable." *Id.*

### 1. Impression of Surveillance

The ALJ found that Malik is a statutory supervisor within the meaning of Section 2(11) of the Act. Argueta and J. Michel Torres testified that Malik told them they were "with the Union" even though they had not made their support known to Respondent. As such, "Malik's comments made them reasonably assume that their union activities were kept under surveillance and therefore violated Section 8(a)(1) of the Act." ALJ Dec. at 20.

### 2. Discharge of Argueta, J.Michel Torres, and J. Martin Torres

The ALJ cited evidence that Miller knew that Argueta and J. Michel Torres engaged in Union activities. Although there was no direct evidence about J. Martin Torres's Union activities, the ALJ found that the activities of J. Michel Torres were "a motivating factor in the Respondent's decision to discharge his brother Jose Martin Torres" and that J. Martin Torres was discharged in retaliation for this brother's union activities. ALJ Dec. at 21, 22. The ALJ concluded that in light of the timing of the terminations – two (2) weeks after Malik identified Argueta and J. Michel Torres as Union supporters and only four (4) days before "Miller's strongly anti-union message to the remaining workers" – the three men "were discharged because of their union activity." *Id.*

The ALJ further found that Respondent failed to prove that it had a reasonable basis for discharging these employees and that it would have done so even in the absence of their connection to the Union.[3] He considered and rejected Respondent's claims that they were

---

[3] The ALJ, on Petitioner's motion and as a sanction for failure to produce materials, precluded Respondent from presenting evidence on the defense that the employees were laid off due to a slowdown in business. ALJ Dec. at 8-9. He further precluded evidence regarding the financial status of Respondent's business, and drew "an adverse inference that the Respondent's financial records, had they been produced, would not

6

discharged for lack of work, misconduct, or poor work performance, noting that Bindra "gave inconsistent and contradictory testimony." *Id.* at 22.  As to Argueta and J. Michel Torres, the evidence established that Respondent "condoned" their alleged misconduct and "would have continued them in its employ, as it had for the four years each had been working for it, had it not been for the Union's appearance on the scene." *Id.* at 23.  Respondent argued that J. Martin Torres was merely a replacement employee for employee Juan Flores who was on temporary leave.  The ALJ rejected this argument, noting that Flores had been back on the job for three works prior to J. Martin Torres's discharge.  *Id.*  Respondent notes that a buyer and salesperson were also laid off at the same time.  *See* Respondent's Opposition ("R's Opp.") at 4, DE [15].

    3.   <u>Respondent's use of threats and interrogations of employees</u>

The complaint below alleged that Respondent, by Miller, threatened employees with unspecified reprisals and/or discharge if they selected the Union, and told them it would be futile to select the Union.  Miller initially denied making these statements.  The March 10 meeting, however, was recorded by an employee, transcribed, and received in evidence by the ALJ.  The transcript establishes that at the meeting, Miller repeatedly threatened employees who might be considering voting for the Union that "those who vote for the union, you will lose your job."  ALJ Dec. at 10.  He stated that "[t]he union is never getting in because we will fight," and suggested unspecified reprisals, stating "don't bring problems for me because I am not going to be happy and if I am not happy you will not be happy."  *Id.*  Faced with the recording, Miller admitted that it was his voice making the statements.  As a result, Respondent amended its answer and admitted that Miller made the threats and futility arguments to the employees.  The ALJ concluded that the

---

support its claim that a downturn in business necessitated the layoff of the three employees." *Id.* at 9.

7

"admitted threats violated Section 8(a)(1) of the Act." ALJ Dec. at 24. Respondent argues that Miller does not have the authority to discharge employees. *See* R's Opp. at 3.

The complaint below further alleged that in July 2015, Bindra, upon learning about the FLSA lawsuit, interrogated employees about their involvement in that litigation and threatened them with unspecified reprisals. Bindra testified that he was "surprised and disappointed," and wanted to meet with the workers. ALJ Dec. at 12. On July 15, 2015, Roberto Reyes, the first-named plaintiff in the FLSA action, was called into a meeting with Miller and Bindra during which he was questioned about the case. Bindra then conducted a meeting with all employees. He read the names of the employees on the lawsuit and asked the employees if they intended to pursue the action. *Id.* at 13, 24. The ALJ concluded that Binda's questioning of the Reyes individually and the remaining employees, without the aid of their attorney, constituted unlawful interrogation and threats of "unspecified reprisals because of their involvement in the filing of [the FLSA] lawsuit." *Id.* at 25-26.

4. <u>Implementation of new work rules and related terminations</u>

On July 21, 2015, one week after Bindra's meeting with the employees regarding the FLSA lawsuit, Respondent implemented rules prohibiting cell phone use during work hours and establishing discipline for lateness. There is no dispute that no written rules were previously imposed on the workers. The rules form had a place for the employee to sign to indicate acknowledgement of, and agreement with, the rules. ALJ Dec. at 14. Five employees, H. Hernandez, M. Hernandez, R. Reyes, J. Reyes, and Sabillon, refused to sign and were discharged on the spot. Respondent claims that it began drafting the rules in June 2015 and that cell phone use was a safety issue. R's Opp. at 5-6 .

The ALJ found that "[t]he evidence strongly suggests, and I find, that the rules were

8

implemented in response to the employees' union and protected, concerted activity," noting that the rules were issued only two weeks after Bindra's coercive interrogation regarding the FLSA case and were "implemented in the context of Miller's strongly anti-union speech to employees, and the Respondent's admitted threats to the workers." ALJ Dec. at 26. He rejected Respondent's reasons for the rules as pretextual. Respondent's argument that the rules were promulgated as part of the change in warehouse locations was belied by the fact that the safety rules "would apply equally to both facilities" and that the workers were at the new facility for seven weeks before the rules were implemented. *Id.* ("if safety was so important to the Respondent it would have implemented its new work rules when it said it would – when it moved to Bethpage."). The ALJ concluded that "the new work rules were implemented in retaliation for the employees' union activities and because they filed the FLSA lawsuit" and thus were unlawful. *Id.* at 27. He further concluded that the discharges of the five employees who would not sign the rules was also unlawful. *Id.*

    5.   Events at the December 9, 2015 Board hearing

The complaint below was amended to include allegations regarding conduct by Respondent, by its attorney, Saul Zabell ("Zabell") on December 9, 2015 in a Board hearing room. Zabell allegedly "(a) threatened employees with legal action in retaliation for engaging [] participating in a Board hearing and because of their Union activity and (b) threatened to report employees to Government authorities in order to intimidate witnesses and to discourage them from participating in Board processes." ALJ Dec. at 28. The ALJ determined that the Union witnesses credibly testified that Zabell in the hearing room "told the employees that he would report them to the immigration authorities and that they would 'not get a penny.'" *Id.*

    6.   ALJ's conclusions of law and remedy

The ALJ concluded that Respondent violated Section 8 (a)(1) and (3) of the Act by discharging Argueta, J. Martin Torres, J. Michel Torres, H. Hernandez, M. Hernandez, R. Reyes, J. Reyes, and Sabillon.   ALJ Dec. at 39.   He further concluded, *inter alia,* that Respondent violated Section 8 (a) by giving employees the impression that their union activities were under surveillance, threatening employees with unspecified reprisals and/or discharge if they selected the Union as their representative, telling employees that it would be futile to select the Union, interrogating employees about their involvement in the FLSA lawsuit, threatening them with unspecified reprisals because of their involvement in the FLSA lawsuit, implementing new work rules, and threatening them in a Board hearing room with legal action in retaliation for participating in a Board hearing and because of their Union activities.   *Id.*

The ALJ recommended[4] various remedies including, *inter alia,* reinstatement of all the discharged employees and rescission of the unlawfully implemented work rules, and an order that Respondent cease and desist from various conduct.   ALJ Dec. at 40-41.   The ALJ granted petitioner's request for enhanced remedies and amended the Remedy, Order and Notice portions of the ALJ Decision by Order dated May 25, 2016.   *See* ALJ Dec. II.   The ALJ found that specific enhanced remedies "are necessary to dissipate the serious unfair labor practices which the Respondent engaged in."   *Id.* at 3.   He amended the remedies to include a broad language that Respondent refrain from engaging in misconduct "in any other manner," required Respondent to provide periodic employee lists to the union, and required public reading and publication of a notice to employees.   *Id.* at 2-3.   The ALJ declined to order additional special remedies of

---

[4] According to the ALJ Decision, "[i]f no exceptions are filed . . . the findings, conclusions, and recommended Order shall . . . be adopted by the Board and all objections to them shall be deemed waived for all purposes."   ALJ Dec. at 41, n.10.

10

requiring training for employees and supervisors on rights under, and compliance with, the Act. *Id.* at 3.[5]

## II.     LEGAL STANDARDS

Section 10(j) authorizes the district court to grant a temporary injunction pending the outcome of unfair labor proceedings before the NLRB:

> The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). In determining whether to issue the temporary injunction, the court applies a two-prong standard: "*First*, the court must find reasonable cause to believe that an unfair labor practice has been committed. *Second*, the court must find that injunctive relief is just and proper." *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 468-69 (2d Cir. 2014) (emphasis in original). "Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm., Inc.,* 67 F.3d 1054, 1059 (2d Cir.1995) (internal citations omitted); *see also Silverman v. J.R.L. Food Corp.,* 196 F.3d 334, 337-38 (2d Cir. 1999) (reversing finding of no reasonable cause, noting that the district court "did not accord [the ALJ's] decision appropriate deference"). In addition, "[t]he NLRB's 'version of the facts should be sustained if within the range of rationality, [and] inferences from the

---

[5] The ALJ also made findings regarding the conduct of the union election and the validity of the results. As those issues are not raised in the petition currently before the Court, those findings are not discussed in this order.

facts should be drawn in favor of the charging party.' " *Dunbar v. Landis Plastics, Inc.*, 977 F. Supp. 169, 175 (N.D.N.Y.1997) (quoting *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir.1980)).

The scope of review is limited, and the court must "uphold the Board's findings of fact that are supported by substantial evidence." *NLRB v. Jewish Home for Elderly of Fairfield Cty.*, 174 F. App'x 631, 631 (2d Cir. 2006) (summary order) (citing 29 U.S.C. § 160(e); *NLRB v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 199 (2d Cir.2003)). Where an ALJ has ruled, that judge's "findings may serve as a point of reference for the district court." *Ley v. Wingate of Dutchess, Inc.,* -- F. Supp. 3d --, 2016 WL 1611598, at *6 (S.D.N.Y. Apr. 22, 2016).

### III. DISCUSSION

#### A. Reasonable Cause

As to the first prong, reasonable cause, "[t]he court need not make a final determination that the conduct in question is an unfair labor practice. It need find only reasonable cause to support such a conclusion." *Major League Baseball Player Relations Comm.,* 67 F.3d at 1059 (citations omitted); *see also Kinney Drugs, Inc. v. NLRB,* 74 F.3d 1419, 1427 (2d Cir. 1996) ("[e]ven if a court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence." (internal quotation marks and citations omitted)). A respondent may not "prevail simply by recasting the evidence in the light most favorable to the respondent." *Jewish Home for the Elderly,* 174 F. App'x at 632. In particular, "[w]hen the NLRB's findings are based on the ALJ's assessment of the credibility of witnesses, they will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony." *Kinney Drugs,* 74 F.3d at 1427 (internal quotation marks omitted).

Section 8(a)(1) of the Act provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the right" to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. §§ 157, 158(a)(1).  Section 8(a)(3) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

The Court determines that the findings of ALJ are amply supported by record and that there is reasonable cause to believe that Respondent violated Sections 8 (a)(1) and (3) of the Act. Respondent gave employees the impression that their Union activities were under surveillance, admittedly threatened employees with reprisals and suggested support for the Union would be futile, interrogated them regarding other protected activities, and implemented work rules in retaliation for their protected activities.  In addition, Respondent discharged employees for actions relating to their Union or other protected activities.  Respondent's arguments in opposition to the petition are based largely upon their preferred interpretation of the weight and merit of testimony given before the ALJ, essentially asking this Court to credit its witnesses over Petitioner's.  The ALJ, who actually heard the testimony and thus was in a better position to assess the credibility and demeanor of witnesses, explicitly found that he could not "find that Respondent's witnesses gave truthful testimony in important areas of their recitations." ALJ Dec. at 18.  The Court finds that the totality of the events described, including, *inter alia*, evidence of Respondent's hostility to the Union, coupled with the ALJ's findings regarding the credibility of witnesses support the finding of reasonable cause to believe that Respondent committed the unfair

13

labor practices found by the ALJ.

**B.     Just and Proper**

Having found that there is reasonable cause to believe that Respondent committed unfair labor practices in violation of the Act, the Court turns to whether the relief sought by petitioner is just and proper.   Injunctive relief is just and proper "when it is necessary to prevent irreparable harm or to preserve the status quo."  *Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.,* 247 F.3d 360, 368 (2d Cir. 2001).  "[T]he appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred." *Id.* at 369; *see also Kreisberg v. HealthBridge Mgmt.,* LLC, 12–CV–1299, 2012 WL 6553103, at *6 (D.Conn. Dec. 14, 2012) ("The status quo that requires protection under § 10(j) is the status quo as it existed before the onset of the alleged unfair labor practices, not the status quo that has come into being as a result of the unfair labor practices being litigated").   The main focus "should be on harm to [union] organizational efforts."   *Paulsen,* 773 F.3d at 469.

1. Cease and desist order

"A cease and desist order is clearly appropriate in order to prevent respondent from engaging in any future unfair labor practices that might undermine the union's organizing campaign." *Blyer ex rel. NLRB. v. P & W Elec., Inc.,* 141 F. Supp. 2d 326, 330 (E.D.N.Y. 2001) (quoting *Blyer ex rel. NLRB v. Domsey Trading Corp.*, No. 91 CV 1304, 1991 WL 148513, *3 (E.D.N.Y. July 30, 1991)).   Respondent suggests that the union organizational efforts have not been harmed since four (4) employees who support the union are still employed by it.   The Court disagrees.   The discharge of the other employees and the environment created by interrogations and threatened reprisals could clearly impact further organizational goals.   Imposition of a cease and desist order and other relief would restore the status quo regarding the union's efforts to

14

organize. Futhermore, the burden on Respondent is minimal in that this relief merely orders it to obey the law and not engage in specific unfair labor practices.

2. Reinstatement of discharged employees

The ALJ recommended, and Petitioner seeks, reinstatement of five (5) of the discharged employees, H. Hernandez, Sabillon, J. Michel Torres, R. Reyes, and J. Reyes. "Interim reinstatement for unlawfully discharged employees is often granted under Section 10(j) relief to restore the status quo and to prevent an 'adverse impact on employee interest in unionization.'" *Ley,* 2016 WL 1611598, at *10 (citing *Kaynard ex rel. NLRB v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980)). Offers of reinstatement serve to "reassure" other employees that their "rights are not illusory." *Fernbach ex rel. NLRB v. Raz Dairy, Inc.,* 881 F. Supp. 2d 452, 467 (S.D.N.Y. 2012).

In its opposition, Respondent requests a hearing to determine if the discharged employees Petitioner seeks to have reinstated "are eligible for employment within the United States," or alternatively, to determine "if Petitioner's actions are akin to unlawfully conspiring with those known to be unauthorized to work in the United States in an effort to circumvent the immigration laws." R's Opp. at 2-3. Respondent also argues that comments made by its counsel regarding the employees' immigration status at the December 9, 2015 hearing were in accordance with the Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 122 S. Ct. 1275 (2002).

The *Hoffman* Court noted that the Immigration Reform and Control Act ("IRCA"), 8 U.S.C. §1324a, "makes it unlawful for employers knowingly to hire undocumented workers or for employees to use fraudulent documents to establish employment eligibility." *Hoffman*, 535 U.S. at 141, 148 (the IRCA "mandates that employers verify the identity and eligibility of all new hires

15

by examining specified documents before they begin work. § 1324a(b). If an alien applicant is unable to present the required documentation, the unauthorized alien cannot be hired. § 1324a(a)(1)"). The Supreme Court found that "allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations." *Hoffman*, 535 U.S. at 151. In the *Hoffman* case, the worker testified that he was born in Mexico, was not legally in the country or authorized to work here, and that he gained employment by using someone else's documentation.[6]

The ALJ Decisions here are silent as to any testimony or evidence regarding the discharged employees' legal status or authorization to work, or whether either the employees or Respondent violated the IRCA. Respondent states only, in a footnote, that "the ALJ in this matter refused to allow any testimony regarding immigration status." *See* R's Opp. at 22 n.21. In response to the petition, it has not provided any evidence that the discharged employees were not authorized to work in the United States. Presumably, Respondent complied with the IRCA when it hired the workers. Absent some proof, Respondent cannot now claim that those same workers are not authorized to work in the United States. As Respondent's unsupported allegations do not support denial of the injunctive relief sought by Petitioner, the Court finds that interim reinstatement is just and proper to restore the status quo.

---

[6]Petitioner does not ask this Court to order backpay under the Act, and indeed, "the provision of final relief in the form of backpay exceeds the district court's authority under Section 10(j), which only provides a district court 'jurisdiction to grant to the Board such *temporary* relief or restraining order as it deems just and proper.'" *Murphy ex rel. N.L.R.B. v. Hogan Transports, Inc.*, 581 F. App'x 36, 39 (2d Cir. 2014) (summary order) (quoting 29 U.S.C. § 160(j) (emphasis added)). Thus the issue is whether, under *Hoffman,* the Court cannot order reinstatement of the employees.

16

## IV. CONCLUSION

For the foregoing reasons, the petition for a temporary injunction pursuant to Section 10(j) of the Act is granted. The Court finds that there is reasonable cause to believe Respondent engaged in unfair labor practices in violations of Sections 8(a)(1) and (3) of the Act, and that injunctive relief is just and proper.

Accordingly, it is hereby ORDERED that Respondent, its officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, pending final disposition of the matters involved herein pending before the Board shall:

1. Cease and desist from:

    (a) Discharging its employees because of their activities on behalf of Local 660, United Workers of American, "the Union," or because of their protected, concerted activities;

    (b) Threatening employees with termination because of their support for the Union;

    (c) Threatening employees that supporting the Union is futile;

    (d) Threatening employees with unspecified reprisals because of their Union activities and other protected, concerted activities;

    (e) Threatening to report employees to government authorities because of their Union activities and other protected, concerted activities;

    (f) Giving employees the impression that Respondent is surveilling their Union activities;

    (g) Interrogating employees regarding their protected, concerted activities;

    (h) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act:

(a)  Within seven (7) days of entry of this Court's Order, offer Henry Hernandez, Augustin Sabillon, Jose Michel Torres, Jose Roberto Reyes, and Javier Reyes, immediate, interim reinstatement to their former jobs, or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed;

(b)  Upon request of the Union, immediately furnish the Union with a list of the names, addresses, and job classifications of all of Respondent's employees as of the latest available payroll date, and furnish to the Union a corrected, current list of its employees' names, addresses, and job classifications at the end of each six (6) month period thereafter until entry of the Board order in this matter;

(c)  Within seven (7) days of entry of this Court's Order, post copies of this Order at all locations where Respondent's notices to employees are customarily posted; maintain such notices free from all obstructions or defacements pending the Board's administrative proceeding; and grant to agents of the Board reasonable access to Respondent's facility to monitor compliance with this posting requirement;

(d)  Within fourteen (14) days of entry of this Court's Order, Respondent shall convene a mandatory meeting of all its employees on work time and at a time to ensure maximum attendance, and require a high level official of Respondent, or a Board agent in the presence of such high level official, to read this Order to all employees, in the presence of a Board agent and an official of the Union; and

(e)  Within twenty-one (21) days of entry of this Court's Order, file with the Court and serve a copy upon the Petitioner, Acting Regional Director of Region 29 of the Board, a sworn affidavit from a responsible official of Respondent that describes with specificity how Respondent complied with the terms of this decree, including the exact locations where Respondent has posted the materials required under this Order.

The petition having been granted, the Clerk of the Court is directed to close this case.

**SO ORDERED.**

*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge


Dated: July 5, 2016
    Central Islip, New York

18